AMERICAN DIAMOND EXCHANGE, INC. *v.*
SCOTT ALPERT ET AL.
(AC 25768)

Bishop, DiPentima and Peters, Js.

Argued October 11, 2006—officially released May 8, 2007

*Steven D. Ecker,* with whom, on the brief, was *Sarah A. L. Merriam,* for the appellant (defendant Jurgita Karobkaite).

*William F. Gallagher*, with whom, on the brief, were *Hugh D. Hughes* and *David R. Babbitz*, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, J. In this appeal, we primarily consider whether the trial court properly concluded that all of the elements had been established for the plaintiff's successful action against the defendant for tortious interference with business expectancy and civil conspiracy and whether it made a proper award of damages.

The plaintiff, American Diamond Exchange, Inc., brought this tort action against the defendant Jurgita Karobkaite and her former husband, Scott Alpert.[1] Following a trial to the court, the defendant was found liable for tortious interference with the plaintiff's business expectancy and civil conspiracy, but the court held that a third count alleging the defendant's violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., had not been proven. The court awarded the plaintiff damages in the amount of $118,000.

On appeal, the defendant claims that the court (1) improperly concluded that the plaintiff had proven all of the elements of tortious interference with a business expectancy, (2) improperly concluded that the plaintiff had proven all of the elements of civil conspiracy, (3) made an award of damages that is not supported by law or the facts and (4) applied an improper burden of proof to the tortious interference claim. We agree with the defendant that the court's award of damages was legally improper and not supported by the evidence. We are not persuaded by the defendant's remaining

[1] Alpert did not contest the pleadings, and a judgment was entered against him. In this opinion, we refer to Karobkaite as the defendant.

claims. We therefore reverse the judgment of the trial court only as it pertains to damages and affirm the judgment in all other respects.

The record reveals the following facts and procedural history. The defendant came to the United States in 1996, when she was twenty years old. She married Alpert in September of the following year. Approximately one month later, Alpert was hired as a retail sales clerk for the plaintiff, a corporation that buys and sells diamonds and other jewelry, located in New Haven. Within the first few months of his employment, Alpert became an estate buyer for the plaintiff.[2]

Alpert testified that throughout his employment, he diverted the plaintiff's customers so that he personally could purchase their jewelry. Alpert would tell the customers that his employer was not interested in the piece that they were selling but that he would like to buy it for the defendant's upcoming birthday or anniversary. Alpert also testified that he diverted customers who had signed consignment agreements with the plaintiff. He would tell those customers that their piece was not moving as quickly as he had hoped but that he personally was willing to purchase it for the defendant. He would typically set up an off-premises meeting to complete the transaction. Alpert would then resell the jewelry at the wholesale level, often in New York City or in other locations by mail or courier service. His selling price for an item usually was 45 to 50 percent higher than what he paid for its purchase. Alpert also admitted to stealing several diamonds from the plaintiff.

Alpert testified that the defendant was fully aware of his diversion scheme from its inception and was a willing participant who shared in the profits. Bank records revealed that the defendant maintained a joint

---

[2] Alpert testified that an estate buyer purchases secondhand jewelry from the general public for resale.

checking account with Alpert throughout the years in question. Checks were drawn on this account to pay for the purchase of jewelry from diverted customers, and deposits were made into this account when those items were resold. Alpert provided several examples of such transactions, and copies of the corresponding check or deposit slip were admitted into evidence. Several of those deposits were for large sums, including a bank check made out to the defendant in the amount of $28,000 from Rich Schatz, Inc., a wholesale buyer to whom Alpert had sold diamonds.

The defendant was present when Alpert made transactions with diverted customers on numerous occasions, her signature is on some of the checks used to purchase the jewelry, and she endorsed checks from the wholesale purchasers. The defendant also sold a diamond to Nagi Jewelers for which she received a check payable to herself in the amount of $828, which she cashed.

In the year 2000, approximately $195,000 was deposited into the defendant's and Alpert's joint account. The defendant also maintained a savings account, into which approximately $136,000 was deposited. During this time, the defendant never earned more than $500 a week, and Alpert's salary was never greater than $96,000 a year. No additional income was listed on their joint tax returns for any of the years involved.

Approximately one year prior to the termination of his employment, Alpert missed a meeting he had arranged with a diverted customer, and the customer called the plaintiff's store looking for him. Alpert was confronted by David Schnee, the president of the plaintiff. Alpert promised Schnee that he would not conduct any business outside the store. At about this time, Alpert admitted to the defendant that he was addicted to crack cocaine. Shortly thereafter, Alpert moved out of the

condominium that he owned with the defendant. Despite their separation, the deposits to and withdrawals from the joint checking account continued.

Approximately one year later, in April, 2002, Schnee hired a private investigator to set up a sting operation that would catch Alpert purchasing jewelry from a diverted customer. Following the successful operation, Alpert confessed all the details of his scheme to Schnee, who terminated his employment immediately. The defendant and Alpert were subsequently divorced in early 2003.

The plaintiff brought suit against the defendant and Alpert in a six count complaint, alleging as to both of them tortious interference with a business relationship or expectancy, violations of CUTPA, and civil conspiracy.[3] At trial, Alpert testified before the court as to the veracity of all of the allegations in the complaint. The defendant, however, maintained throughout the trial that she did not know anything about Alpert's activities. A judgment of default was entered against Alpert on all counts. The court found the defendant liable for tortious interference with a business relationship or expectancy and civil conspiracy but found that she had not violated CUTPA. The court awarded the plaintiff $118,000 in damages. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim is that the court improperly held the defendant liable for tortious interference with the plaintiff's business relationship or expectancy. We are not persuaded by any of the defendant's arguments in support of this claim.

---

[3] The complaint further alleged conversion and breach of contract and fiduciary duty as to Alpert only.

The defendant's claim is comprised of both legal and factual arguments. The defendant's arguments concerning the legal standard that the court applied are entitled to our plenary review. See *Cable* v. *Bic Corp.*, 270 Conn. 433, 440, 854 A.2d 1057 (2004). Under this standard, we determine "whether the court's conclusions were legally and logically correct and whether they are supported by the facts appearing in the record." (Internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 406, 867 A.2d 841 (2005). The defendant's arguments concerning the evidence presented in support of that legal standard, however, are subject to our established and rigorous standard for sufficiency of evidence claims. For such issues, "[w]e must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the [court] could not reasonably and legally have reached [its] conclusion. . . . We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff[s] must produce sufficient evidence to remove the [court]'s function of examining inferences and finding facts from the realm of speculation." (Internal quotation marks omitted.) *Smith* v. *Greenwich*, 278 Conn. 428, 440–41, 899 A.2d 563 (2006).

A cause of action sounding in tort for interference with another's business practices and opportunities has long been recognized in Connecticut. The law in this state "forbids unjustifiable interferences with any man's right to pursue his lawful business or occupation and to secure to himself the earnings of his industry. Full, fair and free competition is necessary to the economic

life of a community, but under its guise, no man can by unlawful means prevent another from obtaining the fruits of his labor." (Internal quotation marks omitted.) *Selby* v. *Pelletier*, 1 Conn. App. 320, 323, 472 A.2d 1285 (1984). A successful action for tortious interference with business expectancies requires the satisfaction of three elements: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 27, 761 A.2d 1268 (2000).

A

The defendant first argues that she cannot be held liable for tortious interference with the plaintiff's business expectancies because nothing that she was found to have done can be considered independently tortious conduct. We disagree.

Our case law has recognized that not every act that disturbs a business expectancy is actionable. "[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 429, 780 A.2d 967, cert. granted on other grounds, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002). Accordingly, the plaintiff must plead and prove at least some improper motive or improper means. Id. "[F]or a plaintiff successfully to prosecute such an action it must prove that . . . the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." (Internal quotation marks omitted.) Id. In the context of a tortious interference claim, the term malice is meant "not in the

sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." (Internal quotation marks omitted.) Id.; see also 4 Restatement (Second), Torts § 766B (1979) (test for intentional interference with prospective contractual relation is whether actor's behavior improper).[4] Our Supreme Court has recognized that the legal theory of tortious interference with a business expectancy encompasses a broad range of behavior. *Blake* v. *Levy*, 191 Conn. 257, 261, 464 A.2d 52 (1983).

There is ample evidence in the record from which the court could have found that the defendant had an improper motive. In its memorandum of decision, the court concluded that the defendant was "a knowing and willing participant in Alpert's schemes and reaped some profits therefrom." These schemes admittedly were advanced purely for the financial betterment of Alpert and the defendant, at the expense of the plaintiff. Although the defendant protests that she could not have had an improper motive because she was not aware of the improper means that Alpert had employed, the court specifically found otherwise.[5]

There is also an abundance of evidence from which the court could have found that the defendant had herself employed improper means to interfere with the

---

[4] Section 767 of 4 Restatement (Second) of Torts provides in relevant part: "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

[5] See part I B.

plaintiff's business expectancy. The court specifically noted several aspects of her involvement: managing the checking account from which the money was withdrawn to pay for jewelry bought from diverted customers and to which the profits were deposited when those purchases were resold at the wholesale level, accompanying the defendant on a number of these transactions; signing and endorsing checks, and depositing large sums of money into a private savings account.

The defendant urges us to ignore the court's inventory of factors proving her specific involvement because they took place prior to the spring of 2001, which is the time the court found that the defendant became an active participant in Alpert's schemes. According to the defendant, any findings of activities before that date cannot be used as evidence of her knowing participation. We disagree. The court used the spring of 2001 as the date after which it found the defendant's claim of ignorance to be unfathomable. The court therefore used this point in time as that from which it would hold her accountable. Its choice of time frame for liability purposes does not in any way negate its findings of the defendant's participation in the events prior to that date, for it is this very participation that furthered the court toward its ultimate determination of knowledge and participation.[6]

We are equally unpersuaded by the defendant's attempt to isolate each of her actions and to claim them

___

[6] We also find no merit in the defendant's argument that the court essentially found her liable for merely encouraging Alpert's tortious interference with the plaintiff's business expectancies, in contravention of our Supreme Court's holding in *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 546 A.2d 216 (1988). In that case, the *only* action alleged to be tortious was the defendant employer's encouragement of its employee to solicit the plaintiff's customers despite the employer's knowledge that the employee had signed a covenant not to do so. The record in the present case, by contrast, reveals the various ways in which the defendant actively participated in the scheme to divert customers.

individually to be innocuous. The court made a specific finding that she was aware of the scheme that these actions furthered. We do not ignore the intent and circumstances surrounding such actions. Furthermore, as we have often recognized, "[i]t is not one fact, but the cumulative impact of a multitude of facts which establishes [liability] in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Sam*, 98 Conn. App. 13, 33, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006).

Finally, the defendant directs our attention to *Holler* v. *Buckley Broadcasting Corp.*, 47 Conn. App. 764, 767, 706 A.2d 1379 (1998). In that case, one of the defendants had confronted his manager with the plaintiff's breach of the employee confidentiality agreement, and, as a result, the plaintiff's employment was terminated. We held that the plaintiff did not allege an improper motive or means. We find *Holler* distinguishable. Whereas in the present case, the defendant and Alpert were the sole cause of the plaintiff's loss, in *Holler*, the plaintiff's own wrongdoing caused his employment to be terminated. Moreover, in *Holler*, the defendant's actions can be justified by obviously proper motives, whereas the defendant before us has none. See, e.g., *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 734 A.2d 112 (1999) (defendant supervisor justified in discharging employee with long record of deficient performance); *PAR Painting, Inc.* v. *Greenhorne & O'Mara, Inc.*, 61 Conn. App. 317, 325–26, 763 A.2d 1078 (defendant inspector justified in criticizing plaintiff's work performance because it was in nature of defendant's function and plaintiff's work was inadequate), cert. denied, 255 Conn. 951, 770 A.2d 31 (2001); *Biro* v. *Hirsch*, 62 Conn. App. 11, 771 A.2d 129 (assistance in retaining counsel to commence legal action justified), cert. denied, 256 Conn. 908, 772 A.2d 601 (2001).

We conclude, on the basis of the record before us, that the court found the requisite improper conduct on the defendant's part.[7]

## B

The defendant next argues that the court improperly failed to require that the plaintiff prove her knowledge of the relationship between the plaintiff and its customers. A review of the record before us reveals that the defendant's argument is unavailing.

It is apparent from the court's written memorandum of decision that it considered the extent of the defendant's knowledge of Alpert's activities. The court recognized that in the pleadings and throughout the trial, the defendant denied having any knowledge of Alpert's activities. The court, however, explicitly rejected the defendant's account, finding that it "strain[ed] credulity . . . ." Instead, it found that she was fully aware by

---

[7] The defendant additionally argues that because the court did not find that her conduct amounted to a CUTPA violation, that same conduct cannot be the basis of a tortious interference claim because the latter carries a lower burden of proof than the former. See *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 753–57, 474 A.2d 780 (1984). We disagree with the defendant's assertion. In determining whether a practice violates CUTPA, the court applies the so-called cigarette rule, under which it must consider: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 155, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). We may readily infer that the court did not hold the defendant liable under CUTPA because it concluded that the balance of these factors weighed against liability. No such balancing test is required for a claim of tortious interference. We further note that the defendant did not seek an articulation of the court's terse finding with respect to this issue.

the spring of 2001 that Alpert was diverting business from his employer. The record reflects that this was the time that Alpert was confronted by his employer about his diversions and was specifically warned not to engage in this conduct again. Because the court explicitly found that Alpert informed her of this scheme, which involved diverting customers, she must have been aware of the business relationship between the plaintiff and these customers.

Having determined that the court properly required proof of the knowledge element, we turn now to the defendant's additional argument that there was insufficient evidence presented to satisfy that element. As we have already stated, there was an abundance of evidence in the record from which the court could have determined that the defendant was a knowing participant in Alpert's schemes to divert customers from the plaintiff. The court made the specific finding that Alpert informed the defendant about the source of the income, and that the withdrawals and deposits continued to their joint checking account after this time.

The defendant takes issue with the fact that this evidence is based, at least in part, on Alpert's testimony, despite the court's statement that he lacked credibility. The defendant, however, takes the court's statement out of context and therefore misinterprets its meaning. In its memorandum of decision, the court stated: "If it were simply Alpert's testimony against [the defendant], the plaintiff would not prevail against her, because Alpert, an admitted thief, drug addict, gambler and liar, has absolutely no credibility. However, there is credible evidence before the court linking [the defendant] to her former husband's illegal schemes against his former employer." The court then went on to enumerate the factors indicating the defendant's involvement in the scheme. Although the court questioned Alpert's general

credibility because of his personal history, it conditioned the truth of that initial assumption on a lack of corroborating evidence. The court considered the defendant's testimony and found her to lack credibility as well. It specifically wrote: "Her self portrayal as an innocent victim of her [former] husband's perfidy was, in short, not credible." Thus, the court ultimately concluded that the evidence before it corroborated Alpert's testimony that the defendant was a knowing participant in his scheme. The court was well within its discretion to so conclude.

This court, as well as our Supreme Court, has repeatedly stated in countless forms the basic evidentiary tenet that the determination of a witness' credibility is the special function of the trier of fact. See *Smith* v. *Smith*, 183 Conn. 121, 123, 438 A.2d 842 (1981) ("[n]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony" [internal quotation marks omitted]). We have also recognized that there are often inconsistencies in witness testimony and have left the resolution of those issues to the fact finder as well. See, e.g., *State* v. *Jones*, 92 Conn. App. 1, 11, 882 A.2d 1277, (2005). The trier need not accept the entire testimony of one party part and parcel but, rather, is entitled to credit some portions of a witness' testimony and discredit others. *State* v. *Hoyeson*, 154 Conn. 302, 305, 224 A.2d 735 (1966). We have no appropriate role at this level in determining which of the various witnesses to credit. See *State* v. *Nowell*, 262 Conn. 686, 695–96, 817 A.2d 76 (2003)

Because we have left such factual determinations in the province of the trial court "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985); *Malkin* v. *United*

*States*, 243 F.3d 120, 124 (2d Cir.), cert. denied, 534 U.S. 821, 122 S. Ct. 55, 151 L. Ed. 2d 24 (2001). We conclude that there was ample evidence in the record from which the court could have reached its decision as to the defendant's knowledge of the business relationship.

C

The defendant's final argument with respect to this claim is that there was no evidence that the plaintiff sustained an actual loss as a result of the defendant's conduct, which is an essential element of the tort. The defendant's argument lacks merit.

"[I]t is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." (Internal quotation marks omitted.) *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 426, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996), cert. denied, 520 U.S. 1213, 117 S. Ct. 1699, 137 L. Ed. 2d 825 (1997). Thus, it must "appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." *Goldman* v. *Feinberg*, 130 Conn. 671, 675, 37 A.2d 355 (1944). Such a determination is a question for the trier of fact, as is the question of whether the plaintiff has suffered an "actual loss." (Internal quotation marks omitted.) *DiNapoli* v. *Cooke*, supra, 428. "If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was made hypothetical by the very wrong of the defendant." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 34 (jury verdict in plaintiff's favor on tortious interference claim equivalent of finding plaintiff suffered actual loss

to support award of punitive damages); see also *DiNapoli* v. *Cooke*, supra, 428 (plaintiff established actual loss for defendant's liability in tortious interference claim even if court could not calculate precise amount of that loss). Accordingly, "an award of compensatory damages is not necessary to establish a cause of action for tortious interference as long as there is a finding of actual loss . . . ." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 34.

The defendant makes two assertions with respect to this argument. She first contends that there is no evidence other than Alpert's testimony that the diverted customers would have transacted business with the plaintiff but for Alpert's actions. As we have already explained, the court was within its discretion to credit the testimony of Alpert that his actions caused a loss. Alpert admitted that all of his customers were people who had entered the plaintiff's retail location with the intention of selling an item of jewelry. It was Alpert who encouraged them to leave the premises and conduct business with him instead. In order to persuade them to do so, he would mislead them into thinking that their business prospects with the plaintiff were inauspicious, either by saying that the plaintiff was not interested in the item or by saying that a consignment item was not selling. Alpert further testified that many of these customers had signed a contract with the plaintiff, which Alpert would alter or remove from the store. This was corroborated by Schnee's testimony that on the night of the sting, he found many consignment records in Alpert's car. We conclude that the plaintiff sufficiently demonstrated a reasonable probability that the diverted customers would have conducted business with the plaintiff but for the tortious interference. See *Goldman* v. *Feinberg*, supra, 130 Conn. 675 (requiring only that plaintiff demonstrate reasonable probability of business relationship, not definite one).

The defendant's second contention is that the plaintiff failed to prove that she proximately caused its loss. Specifically, she argues that the interference with business relations was completed as soon as the customer ended his or her relationship with the plaintiff, whereas all of the actions the court found she committed occurred after Alpert had already diverted the plaintiff's customers. The defendant again attempts to extract each of her actions from the context in which they were committed. The court found her to be an active participant in the ongoing scheme. Her actions helped to perpetuate the diversion of the plaintiff's customers. We cannot accept the defendant's somewhat factitious logic that draws artificial lines between individual transactions within an overarching plan. We therefore conclude that the plaintiff sufficiently proved that its loss was proximately caused by the defendant.[8]

## II

The defendant next claims that the court improperly concluded that she had committed civil conspiracy. The defendant primarily argues that the plaintiff failed to prove that she had combined with Alpert with the intention of engaging in any unlawful conduct, which is an essential element of the cause of action. We disagree.[9]

The elements of a civil action for conspiracy are: "(1) a combination between two or more persons, (2) to do

---

[8] The defendant cites *Collum* v. *Chapin*, 40 Conn. App. 449, 671 A.2d 1329 (1996) in support of this argument. We find that case to be inapposite. In *Collum*, the court stated that the actions alleged in a claim for tortious interference with employment could not have taken place following the date employment ended. In this case, the court found that the defendant "was a knowing and willing participant in Alpert's schemes and reaped some profits therefrom." The court's language thus makes clear that it found the defendant's involvement to transcend any given transaction.

[9] The defendant additionally argues that this claim must fail because the plaintiff did not prove the underlying tort. Because we have already concluded that the plaintiff has met the elements of the underlying tort, this argument also lacks merit.

a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Marshak* v. *Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993), overruled on other grounds by *State* v. *Vakilzaden*, 251 Conn. 656, 666, 742 A.2d 767 (1999) (en banc). Thus, it is an essential element of the tort that the alleged conspirators have combined "to do a criminal act or an unlawful act or a lawful act by criminal or unlawful means." (Internal quotation marks omitted.) *Jones* v. *O'Connell*, 189 Conn. 648, 662, 458 A.2d 355 (1983).

In the criminal context, we have recognized that "it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citation omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 462, 886 A.2d 777 (2005). The reason for that policy, as we have explained, is that "conspiracies, by their very nature, are formed in secret and only rarely can be proved otherwise than by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Leggett*, 94 Conn. App. 392, 400, 892 A.2d 1000, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006). Our Supreme Court has instructed that circumstantial evidence has the same probative force as direct evidence. *State* v. *Farnum*, 275 Conn. 26, 36, 878 A.2d 1095 (2005).

That logic applies with equal force to civil conspiracies. In this case, the court specifically found that in the spring of 2001, Alpert informed the defendant that he was diverting customers from the plaintiff, after which

the defendant did not stop activity in their joint account. There was substantial evidence in the record from which the court could have reached those findings and concluded that the defendant combined with Alpert to divert the customers.

The defendant asserts that the court ignores "undisputed" evidence that Alpert had an independent stock of jewelry and that he ran a legitimate side business, evidence that would support the defendant's claim of innocence. The defendant is incorrect that this fact is undisputed; in fact, it was strongly contested by the plaintiff.[10] That a fact was testified to does not make it an admitted or undisputed fact. *Stoner* v. *Stoner*, 163 Conn. 345, 347, 307 A.2d 146 (1972). Moreover, the court made no mention of Alpert's "legitimate" side business in its memorandum of decision. Given that the court held the defendant liable, and its memorandum of decision listed only factors supporting that liability, we can infer from its silence as to the side business that it did not credit the defendant's testimony on this point. See *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 364, 824 A.2d 1 (2003).

Second, the fact that there is support in the record for a different conclusion is irrelevant at this stage in the judicial process. On appeal, we do not review the evidence to determine whether a conclusion different from the one reached could have been reached. *Nashid* v. *Andrawis*, 83 Conn. App. 115, 118, 847 A.2d 1098, cert. denied, 270 Conn. 912, 853 A.2d 528 (2004). We review the totality of the evidence, including reasonable inferences therefrom, to determine whether it could support the trier's decision. *Considine* v. *Waterbury*,

---

[10] Both Alpert and Schnee testified that Alpert's independent stock of jewelry was sold wholesale or on consignment through the plaintiff and that other than some small items of nominal value, the stock was depleted by December, 1998.

279 Conn. 830, 858, 905 A.2d 70 (2006). We conclude that it does.[11]

The defendant's final argument in support of this claim is that the court improperly shifted the burden of proof from the plaintiff onto her to prove that she had an innocent state of mind. The defendant bases this argument on the court's finding that her self portrayal as an innocent victim was not credible. Contrary to the defendant's interpretation, we read this statement as the court's having made a credibility determination with respect to the defendant. We do not read it as the court's determination that she failed to prove her innocence. It is clearly within the function of the trial court to make such credibility determinations as part of its overall assessment of the plaintiff's claim. See *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 292, 873 A.2d 208 ("[t]he trier is free to accept or reject, in whole or in part, the testimony offered by either party" [internal quotation marks omitted]), cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).

III

The defendant next claims that the court's award of $118,000 in damages was legally improper and not supported by the evidence. We agree with the defendant.

---

[11] The defendant asserts that the court's conspiracy finding lacks logical and chronological coherence because the conduct underlying that finding occurred prior to spring 2001. As we stated previously, the spring of 2001 was the court's benchmark, after which it found it impossible for the defendant to deny knowledge. Just because the court was cautious in setting a date from which to hold the defendant liable does not mean it turned a blind eye to the factors leading to that date, which guided its findings. It was appropriate for the court to consider that the defendant accompanied Alpert to conduct transactions with diverted customers and that she managed their joint checking account because those actions intimate her cognizance of Alpert's scheme. Her conduct prior to spring 2001 therefore provided a proper evidentiary prelude to the court's finding that she was a knowing participant in Alpert's illegal actions.

We accord plenary review to the court's legal basis for its damages award. See *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 603, 724 A.2d 497 (1999). The court's calculation under that legal basis is a question of fact, which we review under the clearly erroneous standard. *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 28, 664 A.2d 719 (1995). In its memorandum of decision, the court explained its award of damages as follows: "It is difficult to calculate the amount of damages sustained by the plaintiff. There were theories running from $100,000 or so to nearer to $400,000. The most reasonable calculation, however, is $118,000, representing a 'profit' by reflecting the difference between $334,000 in deposits in the defendant's bank account and $216,000 in debits to that account over the years in question."

The defendant first argues that the court's damages award was legally improper because it was based on the defendant's profit rather than the plaintiff's loss. We agree with the defendant that the proper measure of damages in an action for tortious interference with a business expectancy is not the profit to the defendant but, rather, the pecuniary loss to the plaintiff of the benefits of the prospective business relation. See *Conrad* v. *Erickson*, 41 Conn. App. 243, 247–48, 675 A.2d 906 (1996) (relying on plaintiff's estimation of business losses to uphold jury's damages award); see also *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 37; 4 Restatement (Second), Torts, supra, § 774A.[12]

---

[12] Section 774A (1) of 4 Restatement (Second) of Torts provides: "One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

The defendant also argues that in its calculation of damages, the court improperly included transactions that occurred between the years 1998 through 2001, despite finding that the defendant became involved in Alpert's illegal conduct beginning sometime in the spring of 2001.[13] We agree that the defendant cannot be held responsible for any of the lost profits the plaintiff suffered before this date. We therefore reverse the judgment of the trial court as to damages only and remand the case for a recalculation of damages on the basis of the plaintiff's lost profits, rather than improper gains to the defendant, and dating only as far back as April, 2001. On remand, the court is limited to consideration of the evidence in the existing record. In its calculation, the court may consider the net profit made by Alpert, as measured by the difference between the amount he earned on the resale of a given item of jewelry and the amount he had paid to acquire that item. The court, however, must also factor into its damages equation that the net profit to Alpert may have been substantially less than it would have been to the plaintiff because of the different price markup each applied.

IV

Finally, the defendant argues that the court applied an incorrect burden of proof to the case.[14] The defendant asserts that because the plaintiff's claims against the defendant were rooted in fraud, the plaintiff was

---

[13] We note that the defendant also disputes the accuracy of the figures on which the court relied, which, according to the defendant, were taken directly from the plaintiff's posttrial brief and were not substantiated.

[14] The defendant concedes that she did not properly preserve this claim and therefore seeks our review under the plain error doctrine. See Practice Book § 60-5. Because a trial court's application of an incorrect burden of proof would constitute plain error, we review the defendant's claim to determine whether plain error exists. See *Herrera* v. *Madrak*, 58 Conn. App. 320, 325–26, 752 A.2d 1161 (2000) (failure to instruct jury on proper burden of proof constitutes plain error).

required to prove its case by clear and convincing evidence, rather than by a preponderance of the evidence. We disagree.

The issue of whether the court held the parties to the proper standard of proof is a question of law, which this court reviews de novo. See *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 139, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). The defendant mistakenly asserts that because fraud was a component of the misconduct alleged by the plaintiff, the complaint is rooted in fraud so as to be subject to the heightened standard of proof by clear and convincing evidence. The cases the defendant cites in support of this claim are distinguishable because they are based specifically and exclusively on the defendant's fraud. See, e.g., id. (claim of fraudulent conveyance); see also *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 458–59, 242 A.2d 708 (1968) (claim of fraudulent deprivation of opportunity to earn commission). Although misrepresentation and fraudulent acts were some of the behaviors that comprised the tortious interference claim, they were not an essential part thereof. Unlike the cases on which the defendant relies, none of the counts against the defendant in the complaint required the court to find that she committed any fraudulent acts herself. The tortious interference claim was satisfied simply by the plaintiff's having demonstrated that the defendant intentionally interfered with its business relations without justification. See *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, supra, 64 Conn. App. 429. In a tortious interference case, such as the one before us, preponderance of the evidence is the appropriate burden of proof. See, e.g., *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 34–37. Accordingly, we decline to find plain error.

The judgment is reversed only as to the award of damages and the case is remanded for a recalculation

of damages on the existing record consistent with this opinion. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.