******************************************

    The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

    All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

    The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# BENCHMARK MUNICIPAL TAX SERVICES, LTD.
## *v.* GREENWOOD MANOR, LLC, ET AL.
### (AC 41924)

Prescott, Bright and Devlin, Js.

*Syllabus*

The plaintiff, B Co., sought to foreclose certain municipal property tax liens
on property then owned by the defendant, G Co. The trial court granted
G Co.'s motion to cite in the city of Bridgeport as a defendant, and G.
Co. filed cross claims against the city and a codefendant, M. G Co.
claimed, inter alia, that M tortiously interfered with its intended sale of
the property to the city and that the city interfered with a proposed
zoning change that would have increased the value of the property.
Thereafter, the city was substituted as the plaintiff and M Co. was
substituted as the defendant. The trial court rendered judgment in favor
of the city and M against M Co. on the cross claims and denied M Co.'s
motion to reargue. On M Co.'s appeal to this court, *held*:

1. The trial court did not err in finding that M Co. failed to establish any
   tortious action by M; the trial court did not credit any evidence offered
   by M Co. in support of its allegation that M had acted to interfere
   with negotiations between the city and G Co., which never reached an
   agreement with the city for a purchase price for the property, and M
   Co. failed to allege on appeal any legal error or an erroneous factual
   basis for the trial court's decision.
2. M Co.'s claim that the trial court erred in finding that the city did not
   tortiously interfere with the business relationship that existed between
   G Co. and M failed as a matter of law; M Co.'s claim consisted of nothing
   more than a request for this court to substitute its own evaluation of
   the evidence for that of the trier of fact, which this court would not do,
   and M Co. failed to demonstrate that the trial court either misapplied
   the law or relied on clearly erroneous factual findings in reaching its
   decision.
3. The trial court did not err in finding that the city did not act improperly
   to devalue the property; M Co. presented no evidence that any member
   of the planning and zoning commission acted improperly in deciding
   not to change the zoning designation of the property, the trial court
   was free to reject an inference that members of the commission acted
   improperly and to conclude that the commission may have decided
   against a zone change for the subject property, despite initial support
   for a change, for a reason other than improper interference by the city,
   and M Co. conceded at oral argument before this court that tortious
   interference was not the only reasonable inference the trial court could
   have drawn based on the evidence presented.

Argued September 13—officially released November 19, 2019

*Procedural History*

Action to foreclose certain municipal property tax
liens, and for other relief, brought to the Superior Court
in the judicial district of Bridgeport, where the court,
*Hartmere, J.*, granted the named defendant's motion
to cite in the city of Bridgeport as a defendant; there-
after, the named defendant filed cross claims against
the city of Bridgeport et al.; subsequently, the court,
*Tyma, J.*, granted the motion of the city of Bridgeport
to be substituted as the plaintiff; thereafter the court,
*Hon. Richard P. Gilardi*, judge trial referee, granted
the named defendant's motion to substitute Main Street
Business Management, Inc., as the defendant; subse-
quently, the cross claims were tried to the court, *Rad-*

*cliffe, J.*; judgment in favor of the City of Bridgeport et al.; thereafter, the court, *Radcliffe, J.*, denied the substitute defendant's motion to reargue, and the substitute defendant appealed to this court. *Affirmed.*

*Jonathan J. Klein*, for the appellant (substitute defendant-cross claim plaintiff Main Street Business Management, Inc.).

*Thomas W. Moyher*, with whom, on the brief, was *James M. Nugent*, for the appellee (cross claim defendant Manuel Moutinho).

*Juda J. Epstein* filed a brief for the appellee (substitute plaintiff city of Bridgeport).

*Opinion*

PRESCOTT, J. In this action to foreclose certain municipal property tax liens on a 9.9 acre parcel of property in Bridgeport (property),[1] the substitute defendant and cross claim plaintiff, Main Street Business Management, Inc. (Main Street),[2] appeals from the trial court's judgment rendered against it on its cross claim alleging that the cross claim defendant, Manuel Moutinho, tortiously interfered with a business expectancy and violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110 et seq. (CUTPA), and on its counterclaim alleging that the city engaged in tortious interference with a business expectancy and improperly sought to affect the property's value adversely by interfering with a proposed zone change.[3]

On appeal, Main Street, as Greenwood's successor in interest, claims that the court improperly determined that (1) Moutinho did not tortiously interfere with a proposed sale of the property by Greenwood to the city, (2) the city did not tortiously interfere with the business relationship between Greenwood and Moutinho, and (3) the city did not tortiously interfere by causing the city's planning and zoning commission (commission) to reject a zoning reclassification that would have benefited Greenwood by increasing the property's marketability. We disagree and affirm the judgment of the trial court.[4]

The following facts, which either were found by the court or are not in dispute, and procedural history are relevant to our disposition of the claims on appeal. In January, 2009, after years of negotiations, Moutinho finalized a sale of the property to Greenwood, exchanging a warranty deed for a purchase money mortgage of $2 million. Greenwood intended to develop the property for use as a multiunit residential complex. Such use, however, was not permitted at the time the sale closed because the property was zoned R-A, or single-family residential, and thus required a zone change to R-C, or multifamily residential, in order to be developed in accordance with Greenwood's plan.

Although Greenwood never filed a zone change application, it was aware that, in 2008, the commission had begun the process of revising the city's master plan of development and was engaged in a comprehensive reevaluation of zoning regulations and zoning districts throughout the city. As part of this process, the commission considered whether to adopt a zone change for the property from R-A to R-C.[5] Ultimately, the commission decided to leave the zoning classification for the property unchanged.

Both before and after Moutinho finalized his sale of the property to Greenwood, the city expressed an interest in purchasing the property for use in a flood plain control project and for other purposes. The city

engaged in negotiations with Moutinho, both during the time he owned the property and later as the holder of an interest in the property by virtue of the mortgage deed received from Greenwood. The city also negotiated with Greenwood to buy the property. The city never entered into a contract for sale with either Moutinho or Greenwood, as there was never a meeting of the minds regarding a sale price.[6]

In August, 2011, Benchmark, which had acquired from the city certain liens for delinquent property taxes assessed against the property in 2008 and 2009, commenced this action to foreclose those liens. At that time, the property was encumbered by a number of other liens and interests that were subsequent in right, including the mortgage held by Moutinho.

Greenwood filed an answer and special defenses to the foreclosure complaint. It subsequently also filed cross claims against the city and Moutinho.[7] The gravamen of the allegations underlying Greenwood's cross claims was that Moutinho and the city had participated in a scheme to prevent a sale of the subject property from Greenwood to the city with the intent that Moutinho would foreclose on his mortgage and, after reacquiring title, sell the property to the city himself at a price lower than that proposed by Greenwood. Greenwood further alleged that the city had somehow interfered with the sale of the property from Moutinho to Greenwood and, hoping to diminish the property's value to Greenwood's detriment, also interfered by meddling in the commission's consideration of a zone change affecting the property.

On May 8, 2018, in accordance with a stipulation by the parties, the trial court, *Radcliffe, J.*, rendered a partial judgment as to liability on the foreclosure complaint, determining that the amount of debt owed by Main Street to the city was $84,345.52. The trial court did not determine at that time either the fair market value of the property or whether the foreclosure of the property should be a strict foreclosure or a foreclosure by sale.[8]

The court then conducted a two day trial on the cross claim and counterclaim. On May 11, 2018, the trial court rendered a judgment in favor of Moutinho on the cross claim and in favor of the city on the counterclaim. With respect to Moutinho, the court found that he had never interfered with any business relationship that existed between the city and Greenwood. Although the court found that Moutinho and his attorney had met with city officials regarding the property, including with Bill Finch, the city's mayor at the time, the court found that Finch never directed city officials to cease negotiations with Greenwood regarding a sale price or to negotiate exclusively with Moutinho. With respect to the counterclaim against the city, the court found that the city properly was entitled to negotiate with both Moutinho

and Greenwood about acquiring the property and that it never engaged in any fraud or other improper action that would support a cause of action for tortious interference. The court further found that there was no improper action taken by the city with respect to the comprehensive rezoning of city property, including the decision not to change the zoning classification for the subject property. This appeal followed.[9] Additional facts will be set forth as necessary.

I

Main Street first claims that the court improperly found that Moutinho did not tortiously interfere with a proposed sale of the property by Greenwood to the city. Moutinho counters that the court correctly determined that Main Street failed to meet its burden of proving that any contract or other business expectancy existed between the city and Greenwood or, in the alternative, that he ever engaged in any tortious conduct intended to interfere with any business expectancy even if one existed. We agree that Main Street failed to establish any tortious action by Moutinho and, accordingly, the court properly ruled in his favor.[10]

"It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. . . . The plaintiff need not prove that the defendant caused the breach of an actual contract; proof of interference with even an unenforceable promise is enough. . . . A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . It is also true, however, that *not every act that disturbs a contract or business expectancy is actionable. . . .* A defendant is guilty of tortious interference if he has engaged in improper conduct. . . . [T]he plaintiff [is required] to plead and prove at least some improper motive or improper means." (Citation omitted; emphasis added; internal quotation marks omitted.) *Brown* v. *Otake*, 164 Conn. App. 686, 709–10, 138 A.3d 951 (2016). "Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort." (Internal quotation marks omitted.) Id., 710.

Whether a party intended tortiously to interfere with a business expectancy is a question of fact. *Loiselle* v. *Browning & Browning Real Estate, LLC*, 147 Conn. App. 246, 259, 83 A.3d 608 (2013). If a "claim challenges the accuracy of the court's factual findings, our review is limited to the clearly erroneous standard. In a case

tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the [judgment] to which it is entitled. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [A] finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Internal quotation marks omitted.) Id. As a reviewing court, "[w]e cannot act as a factfinder or draw conclusions of facts from the primary facts found, but can only review such findings to determine whether they could legally, logically and reasonably be found, thereby establishing that the trial court could reasonably conclude as it did." *Selby* v. *Pelletier*, 1 Conn. App. 320, 327, 472 A.2d 1285 (1984). Moreover, "the fact that there is support in the record for a different conclusion [than the one reached by the court] is irrelevant at this stage in the judicial process. On appeal, we do not review the evidence to determine whether a conclusion different from the one reached could have been reached. . . . [Instead] [w]e review the totality of the evidence, including reasonable inferences therefrom, to determine whether it could support the trier's decision." (Citation omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 101, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007).

In the present case, it is reasonable to infer from the court's ruling in favor of Moutinho that the court chose not to credit any of the evidence offered by Main Street in support of its allegation that Moutinho had acted to interfere with negotiations between the city and Greenwood, which never reached any agreement with the city about a sale price for the property. Primarily, Main Street's evidence that Moutinho tortiously interfered consisted of a meeting between Moutinho and the mayor that the court found had occurred in 2008. From its brief, it is not entirely clear how Main Street contends that this meeting in 2008 interfered with the negotiations between the city and Greenwood that took place in 2009, after Greenwood had acquired the property from Moutinho. Nevertheless, rather than directing our attention to any legal error or an erroneous factual basis that would tend to undermine the court's determination that Main Street failed to meet its burden of demonstrating a tortious interference by Moutinho in the failed negotiations between Greenwood and the city, Main Street, in effect, asks us to reexamine the evidence and to come to a different conclusion than the one reached by the trial court. As we have explained, this is outside

the scope of our review.

At trial, Main Street offered testimony from Greenwood's principal, Gus Curcio, regarding Greenwood's efforts to sell the property to the city. Curcio testified on direct examination that he believed that "Moutinho repeatedly went to the city and told them not to buy [the property] from [Greenwood] . . . because he was going to foreclose. He would sell it to them cheaper. Repeatedly. Not once. Not twice. But several times." On cross examination, however, Curcio admitted that he had no documentary evidence to support his assertions that Moutinho had instructed or asked the city not to purchase the property from Greenwood. He further testified that he had no personal knowledge of any conversations between Moutinho and anyone associated with the city.

Finch later testified that at some point Moutinho's attorney had contacted him to explain that Moutinho was going to foreclose on his mortgage to acquire the property and that the city should deal with Moutinho rather than Greenwood. Finch, however, was unable to say why the city ultimately elected to stop negotiating with Greenwood. He explained that he never instructed the city to end negotiations with Greenwood at the request of Moutinho or his attorney. Main Street has not directed our attention to any other evidence that would support an inference that Moutinho acted in a manner amounting to fraud, misrepresentation, intimidation, or extortion. The court was free to disregard Curcio's unsupported and self-serving testimony. We simply cannot conclude on the basis of the record presented that the court's finding that Main Street failed to demonstrate tortious interference by Moutinho is clearly erroneous.

## II

Main Street next claims that the court improperly found that the city did not tortiously interfere with the business relationship that existed between Greenwood and Moutinho. As with the prior claim, Main Street's arguments on appeal consist of nothing more than a request for us to substitute our own evaluation of the evidence for that of the trier of fact, which, as we have explained, we will not do. Because Main Street has failed to demonstrate that the court either misapplied the law or relied on clearly erroneous factual findings in reaching its decision, this claim fails as a matter of law.

## III

Finally, Main Street claims that the court improperly concluded that the city had not acted improperly to devalue the property by causing the commission to reject a proposed zoning reclassification that arguably would have increased the property's value. We are not persuaded.

The following facts are relevant to our discussion of this claim, and include, in part, facts set forth by this court in *Greenwood Manor, LLC* v. *Planning & Zoning Commission*, 150 Conn. App. 489, 90 A.3d 1062, cert. denied, 312 Conn. 927, 95 A.3d 521 (2014), of which the trial court took judicial notice. As previously set forth, at the time Moutinho conveyed the property to Main Street's predecessor in interest, Greenwood, the property was situated in an R-A zone classified for single-family residences. Greenwood understood that a change in the property's zone classification from R-A to R-C would be needed in order to utilize the property for denser residential development. The commission was in the process of revising the city's master plan of development, and the commissioners had several preliminary discussions in which some commissioners expressed an interest in rezoning the property from R-A to R-C.

A preliminary vote in April, 2009, suggested that there was support for a zone change, with six commissioners voting in favor and only one voting against. In August, 2009, Finch sent a letter to the commission proposing an unrelated amendment to the proposed revised master plan. In that letter, Finch also asked that the full commission not adopt proposed zone changes for three parcels, including the subject property, from low density residential land use arguing that the rezoning of those parcels "ha[d] become a distraction from the larger reforms at stake in the adoption of this progressive master plan and our new zoning regulations." Additional public hearings were held in September, October and November, 2009. See *Greenwood Manor, LLC* v. *Planning & Zoning Commission*, supra, 150 Conn. App. 493–97. At those hearings, the commission heard from a number of individuals, some of whom spoke in favor of rezoning the property and others who advocated for leaving the zone classification unchanged. Id. A preliminary vote taken at the November 14, 2009 hearing was five to three in favor of taking no action with respect to the property. Id., 497. When the issue was put to a final vote on November 30, 2009, no change in zone for the property was approved, with the commissioners voting six to three against a zone change. Id., 498.

Greenwood appealed from the final vote to the Superior Court, which dismissed the appeal on the ground that Greenwood was neither statutorily nor classically aggrieved by the commission's decision. Id., 498–99. This court, after granting certification to appeal, affirmed the decision of the Superior Court. See id., 492.[11]

In its appellate brief, Main Street concedes that "there was no direct evidence adduced at trial that [the mayor] or anyone else in city government exercised improper influence or coerced any member of the commission

to leave the zone designation of the property unchanged when the commission formally voted on a package of zoning changes . . . ." Nevertheless, Main Street contends that the "only evidence of an explanation for [the commission's] turnaround was Finch's letter to the commission stating that the proposed change was a 'distraction'." Main Street argues that it goes against common sense that the letter alone would have convinced commissioners to change their votes and that the only reasonable inference the court could have drawn was that the vote change was the result of tortious interference. We are wholly unpersuaded for the following reasons.

First, the city had no burden to demonstrate a rationale for the commission's decision. Rather, it was Main Street's burden to show by a preponderance of the evidence that the commission changed its vote on the zone change as a result of the tortious interference of the city. Second, the trial court expressly found that no evidence was presented that any member of the commission "acted improperly, was subject to a conflict of interest or in any way failed to discharge the duties of a member of [the commission] in this matter." Main Street admits that it failed to present such evidence, but nevertheless suggests that the court should have inferred from the circumstances presented that it met its burden of demonstrating tortious interference. The court, however, was entirely free to reject the inference suggested by Main Street and to conclude that the commission changed its decision for a reason other than improper interference by the city. Moreover, such a contrary inference is supported by the record. In this court's opinion dismissing the zoning appeal, we identified a number of possible reasons why the commission may have decided against the zone change despite initial support for a change, including the impassioned arguments of residents against a zone change. See *Greenwood Manor, LLC* v. *Planning & Zoning Commission*, supra, 150 Conn. App. 495–96. Finally, Main Street conceded at oral argument before this court that tortious interference was not the only reasonable inference that the court could have drawn on the basis of the record before it. For all these reasons, we reject this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The original plaintiff, Benchmark Municipal Tax Services, Ltd. (Benchmark), acquired from the city of Bridgeport (city) the tax liens that are the subject matter of the foreclosure action. During the pendency of the foreclosure action, however, Benchmark conveyed those liens back to the city, which later was substituted as the plaintiff.

[2] The original named defendant, Greenwood Manor, LLC (Greenwood), conveyed the property to Main Street on January 8, 2014, after this action was commenced. At the same time, Greenwood assigned to Main Street all of its rights and interests with respect to the foreclosure action, and Main Street was substituted as a defendant.

In addition to Greenwood, the foreclosure complaint named the following additional parties as defendants by virtue of an interest in the property that was subsequent in right to the tax liens: Manuel Moutinho; Greenwood

Estates, Inc.; Rio, Inc.; Regensburger Enterprises, Inc.; Millionair Club, Inc.; Cummings Enterprises, Inc.; Albina Pires; Robin Cummings; Joseph Regensburger; Richard Urban; and Dominique Worth. Of these parties, only Moutinho is a participant in the present appeal.

[3] Although the court had not rendered a final judgment on the foreclosure complaint at the time this appeal was filed, the judgment disposing of the cross claim and counterclaim was, nonetheless, immediately appealable. See Practice Book § 61-2 ("[w]hen judgment has been rendered on an entire . . . counterclaim or cross complaint . . . such judgment shall constitute a final judgment").

[4] Main Street also claims on appeal that the court improperly ruled against it on its CUTPA count. The court, however, provided three grounds for rejecting the CUTPA claim: (1) Main Street failed to satisfy the so-called "cigarette rule"; (2) Main Street failed to demonstrate an ascertainable loss; and (3) the transaction did not involve consumers. On appeal, Main Street challenges only the second and third grounds. Main Street's failure to raise and brief any challenge to the court's ruling regarding the cigarette rule, a failure that it acknowledged at oral argument before this court, renders moot its other challenges to the court's rejection of the CUTPA count. See *State* v. *Lester*, 324 Conn. 519, 527, 153 A.3d 647 (2017) (if "an appellant challenges a trial court's adverse ruling, but does not challenge all independent bases for that ruling, the appeal is moot"). Accordingly, we dismiss as moot that portion of Main Street's appeal challenging the court's ruling on the CUTPA count.

[5] As part of its comprehensive review of the city's zoning map, the commission considered proposed changes to the zoning map with respect to several individual parcels, including the subject property. See *Greenwood Manor, LLC* v. *Planning & Zoning Commission*, 150 Conn. App. 489, 493–94, 90 A.3d 1062, cert. denied, 312 Conn. 927, 95 A.3d 521 (2014).

[6] The evidence admitted at trial demonstrated that the city had sent Greenwood a proposed sale contract that did not contain a purchase price. Greenwood responded, offering to sell the property for $3.5 million, which the city did not accept. Thereafter, negotiations ended.

[7] When the city later reacquired the tax liens from Benchmark and was substituted as the plaintiff, the cross claim technically became a counterclaim. See Practice Book § 10-10 ("any defendant may file counterclaims against any plaintiff and cross claims against any codefendant"). Therefore, we refer to the cross claim against the city as the counterclaim.

[8] As the court later explained in its memorandum of decision resolving the cross claim and counterclaim, it "refused to find that the fair market value was $100,000 [as stipulated by the parties] in the absence of an appraisal or any other expert testimony to that effect. That refusal [is supported by] the testimony in this case, which shows that the property was purchased for $900,000 and that there are various encumbrances in the millions of dollars on [the] property. The court refused to accept [the stipulated fair market value] and, in the absence of an appraisal, refused to find that the remedy by way of strict foreclosure was appropriate rather than foreclosure by sale, and that determination was left to another day."

[9] On July 24, 2018, the city moved for a judgment of strict foreclosure. On August 17, 2018, Moutinho filed a motion to terminate the automatic appellate stay triggered by the present appeal so that the foreclosure action could proceed. The trial court granted that motion on September 17, 2018. Main Street filed a motion for review of the ruling. On January 9, 2019, this court granted review but denied the relief requested. Because the claims for money damages in tort at issue in the present appeal survive even after title to the property vests in another party, there is no danger that the present appeal would be rendered moot as a result of the lifting of the stay.

[10] Because we agree that Main Street failed to prove that Moutinho's actions were tortious, it is unnecessary to consider Moutinho's arguments that a business expectancy never existed between the city and Greenwood or that Main Street failed to demonstrate any actual loss.

[11] We held that if a zoning commission, during the process of sua sponte amending its zoning regulations or zoning map, refrains from altering in any manner the zoning classification of a particular property, and that property had not been specified as the subject of any application then before the commission, the property was not "land involved in the decision" of the commission pursuant to General Statutes § 8–8 (a) (1), and, therefore, the owner of such property was not statutorily aggrieved by the commission's inaction. *Greenwood Manor, LLC* v. *Planning & Zoning Commission*, supra, 150 Conn. App. 512. Furthermore, the owner of property not the subject of

any zone change application was not classically aggrieved by a decision that retained that property's current zoning designation because the owner was not specially and injuriously affected by the commission's decision to maintain the status quo. Id., 513–14.

––––––––––––––––––––––––––––––––