DELONE ROBINSON ET AL. *v.* CURTIS ROBINSON
(AC 27467)

Flynn, C. J., and McLachlan and Harper, Js.

Argued April 24—officially released August 7, 2007

*Carlton L. Hume,* with whom was *Charleen Merced,* law student, for the appellants (plaintiffs).

*Greg S. Krieger,* with whom was *John Stephen Papa,* for the appellee (defendant).

*Opinion*

McLACHLAN, J. The plaintiffs, Delone Robinson, Ray Johnson, Devone Robinson, Cullen Lomax and Herbert Martin, appeal from the judgment of the trial court, rendered after a trial to the court, in favor of the defendant, Curtis Robinson. The plaintiffs claim that the court improperly determined that the defendant did not tortiously interfere with the plaintiffs' business expectancy. We affirm the judgment of the trial court.

From the evidence presented at trial, the court reasonably could have found the following facts. During approximately 1999 through 2002, the plaintiffs were involved in a rap musical group known as "Fort Knox." Devone Robinson, Lomax and Martin, who were teenagers at the time, comprised the lyrical group. Devone

Robinson's father, Delone Robinson, and his wife, Wanda Robinson, comprised the management team, and Johnson was an investor.

Prior to 2002, Fort Knox worked in a studio in Atlanta, Georgia, composing music. During this time, they achieved a modicum of success, performing at concerts and events primarily in the Greenwood, South Carolina, area, including appearing as the opening act for the world renowned artist, Busta Rhymes. The group also appeared on television and on radio.

At some point in 2000 or 2001, Delone Robinson approached his brother, the defendant, and asked him if he had any contacts in the recording industry. Curtis Robinson referred Delone Robinson to an acquaintance, Darrell Miller, an entertainment lawyer in Los Angeles, California. Delone Robinson contacted Miller and sent to him some Fort Knox recordings. Soon after, the group traveled to Miller's office in Los Angeles.

On May 23, 2002, Fort Knox performed at Miller's office for another of Miller's clients, Percy Miller, a rap mogul known throughout the recording industry as Master P. At that time, Master P had a ubiquitous presence in the rap music industry; he was well known as both an artist and producer, involved in the film and television industries, and he owned a clothing line. In May, 2002, Master P was part of One Up Entertainment, LLC, which was doing business as No Limit Records.[1]

Apparently impressed with Fort Knox' performance at Miller's office, Master P invited the group to his

---

[1] At some point, Master P changed the name of his record label from "No Limit Records" to "New No Limit Records" in an effort to create a new face and redefine himself. At trial, there was conflicting testimony as to which label Master P was acting under during the negotiations with Fort Knox. For the purposes of this opinion, the name distinction is irrelevant. We therefore refer in this opinion to the record company as "No Limit Records" for consistency.

Hollywood mansion for a photography shoot. He gave each member of the group several outfits from his "New No Limit Gear" clothing line, which they modeled for a magazine and were permitted to keep. The group then returned home to South Carolina to attend a high school graduation.

Sometime after his initial meeting with Fort Knox, Master P flew the group from South Carolina to New York City. In New York City, Fort Knox appeared on a show on the Black Entertainment Television network, which featured artists on the No Limit Record label. According to the testimony of Delone Robinson, Master P also took Fort Knox on a shopping spree in New York, spending more than $10,000 on apparel for the group. Upon leaving New York City, Master P indicated that he would summon the group to California in the coming week. Unfortunately for Fort Knox, its lavish experiences with Master P had come to an end.

Shortly after the group returned to South Carolina from New York, Miller and Master P delivered a series of contracts to them, which related to Miller's legal representation of Fort Knox and a recording contract from No Limit Records. Upon receiving the contracts, Delone Robinson sent a copy of the recording contract to another attorney in Atlanta to review. On June 17, 2002, the attorney sent a draft of the contract to Miller with suggested changes. Thereafter, the negotiations stalled for several months.

During the period in which the negotiations were stalled and the group was waiting for Master P to summon them to California, Delone Robinson requested that the defendant contact Miller to check on the status of the negotiations. Delone Robinson testified that the defendant told him that during his conversations with Miller, the defendant told Miller that the contract was a "Mickey Mouse" contract because it contained no

advance money. At trial, the defendant denied making any statements to Miller criticizing the contract.

Eventually, it became clear that the relationship between Fort Knox and Master P had ended and, in order to facilitate Fort Knox' negotiations with other record companies, No Limit Records delivered a letter to Fort Knox officially revoking its offer and terminating the relationship. Although the exact reasons for No Limit Records' change of heart were never established, in a deposition that was admitted at trial, Miller testified that around the time the relationship ended, Master P was going through a change in distribution companies, which could have been a factor. The defendant also presented testimony from Delone Robinson's cousin, Victor Thomas, who indicated that Delone Robinson told him that it was the Atlanta lawyer who had "screwed up his deal." Of course, Delone Robinson claimed that a business relationship between Fort Knox and No Limit Records never came to fruition because of the defendant's statements to Miller disparaging the contract. At trial, Delone Robinson conceded, however, that he had no direct evidence that the defendant's statements caused the relationship to fail.

On February 14, 2006, the plaintiffs filed an amended two count complaint alleging tortious interference with a business expectancy and "negligent interference with a business expectancy."[2] In relevant part, the complaint alleged that the defendant's unsolicited communications with Miller regarding the contract between Fort Knox and No Limit Records caused No Limit Records not to sign the contract and to sever business dealings with Fort Knox, thereby tortiously interfering with the

---

[2] Despite its title, this count appears to state a cause of action for negligent interference with contractual obligations, and the record reflects that the court treated it as such. Count two of the plaintiffs' amended complaint is not, however, the subject of this appeal, and therefore we need not address its merits.

plaintiffs' business expectancy. From February 22 through 24, 2006, a trial to the court was conducted, at which the court heard testimony from, inter alia, Delone Robinson, Wanda Robinson, the defendant and Thomas, as well as the recorded deposition testimony from Miller. On February 24, 2006, upon conclusion of the trial, the court rendered judgment in favor of the defendant on both counts. This appeal followed.

On appeal, the plaintiffs claim that the court made improper findings with respect to its ultimate conclusion that the defendant did not tortiously interfere with the plaintiffs' business expectancy. Specifically, the plaintiffs claim that the court improperly determined that the plaintiffs' cause of action failed as a matter of law because they could not establish that a contractual relationship existed between Fort Knox and No Limit Records. The plaintiffs further claim that they presented sufficient evidence to establish their cause of action, and therefore the court's judgment in favor of the defendant was improper.[3]

The plaintiffs' claims are comprised of both legal and factual arguments. The plaintiffs' arguments concerning the legal standard that the court applied are entitled to our plenary review. See *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 89, 920 A.2d 357 (2007). "Under this standard, we determine whether the court's conclusions were legally and logically correct and

---

[3] The defendant argues that we should decline to review the plaintiffs' claims on appeal because the plaintiffs did not provide this court with either a memorandum of decision or a signed transcript. See Practice Book §§ 60-5, 64-1. The plaintiffs have provided an unsigned transcript of the proceedings, and the defendant indicated at oral argument before this court that there is no issue with the accuracy of that transcript. On occasion, we have entertained appellate review of an unsigned transcript when it sufficiently states the court's findings and conclusions. *Tisdale* v. *Riverside Cemetery Assn.*, 78 Conn. App. 250, 254 n.5, 826 A.2d 232, cert. denied, 266 Conn. 909, 832 A.2d 74 (2003). We have reviewed the transcript of this case and conclude that it is adequate for our review.

whether they are supported by the facts appearing in the record." (Internal quotation marks omitted.) Id. The plaintiffs' arguments concerning the evidence presented in support of that legal standard and their sufficiency of the evidence claim, however, are subject to our established and rigorous standard for sufficiency of the evidence claims. See id. "For such issues, [w]e must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge . . . who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the [court] could not reasonably and legally have reached [its] conclusion. . . . We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff[s] must produce sufficient evidence to remove the [court]'s function of examining inferences and finding facts from the realm of speculation." (Internal quotation marks omitted.) Id.

The plaintiffs first argue that the court made an improper legal determination that proof of a contractual relationship was a requisite for recovery under a theory of tortious interference with a business expectancy. See *Blake* v. *Levy*, 191 Conn. 257, 259, 464 A.2d 52 (1983) ("[a]lthough this court has required privity of contract in order to sustain a claim for negligent interference with contract obligations . . . there is no such requirement in cases involving intentional interference with business relations" [citations omitted]). According to the plaintiffs, the court found in favor of the defendant on the ground that because there was no executed contract between No Limit Records and Fort Knox, the plaintiffs' cause of action failed as a matter of law. We disagree with the plaintiffs' interpretation of the court's findings.

In support of their argument that the court improperly determined that the existence of a contractual relationship between Fort Knox and No Limit Records was a requisite to the plaintiffs' cause of action, the plaintiffs rely on the court's statement that *"with respect to the second count of negligent interference with a business expectancy* . . . there must be a contract, and clearly there is no contract here." (Emphasis added.) Clearly, the court made this reference to a contractual relationship in the context of count two, which the court treated as a cause of action for negligent interference with contractual obligations. Privity of contract is a requisite for that cause of action. *Blake* v. *Levy*, supra, 191 Conn. 259. The plaintiffs have not challenged the court's determination as to the second count of their complaint on appeal.

The plaintiffs further rely on the court's finding that "[i]t's clear from the evidence that there was no contract between Fort Knox and Master P and that whole relationship could have fallen by the wayside because Master P never signed the agreement." This argument views the statement in isolation, ignoring entirely the next sentence of the court's finding that "[t]he question is, whether or not Master P never signed the agreement because of the activities and the interference of the defendant." This statement, and the subsequent analysis by the court, clearly demonstrates that the court properly addressed the issue by applying the law to the allegations in the plaintiffs' complaint that the actions of the defendant "caused said contract not to be signed by 'One-Up Entertainment, LLC, dba No Limit Records' . . . ." Thus, although the existence of a contractual relationship is not a requisite for the plaintiffs to prove tortious interference with a business expectancy, where as here, the alleged loss incurred by the plaintiffs was the termination of the business negotiations (i.e., Master P's decision to revoke his offer to Fort Knox), the

plaintiffs had to prove that the defendant's interference caused that loss. See *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 33, 761 A.2d 1268 (2000) (in action for tortious interference with business expectancy, plaintiff must prove, inter alia, that defendant's interference caused plaintiff to suffer loss). Our review of the record reveals, therefore, that the court neither made nor relied on an improper legal determination in finding in favor of the defendant. Accordingly, we conclude that the plaintiffs' claim is without merit.

The plaintiffs next claim that they presented sufficient evidence to support a finding in their favor on their claim of tortious interference with a business expectancy. "[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffered actual loss." Id., 32–33.

In finding in favor of the defendant, the court determined that the plaintiffs' cause of action failed on the issues of interference, intent and causation. With respect to the interference requirement of the second element of the cause of action, the court stated: "Whatever [the defendant] may have said to [Miller] about the inadequacies of the contract, having a no bonus clause, or having no advance, and that apparently being the characterization of a Mickey Mouse contract, Mr. Miller knew all along, and he certainly would not have influenced—in fact, he agreed that the contract was inadequate in the particulars that have been raised, namely, it had no bonus for signing and it didn't have any advance. He knew that. He knew it because this

was a new group, and it was rather common for, apparently, as he testified, for such a contract to be propounded. So, he could not have been influenced in the slightest way by what [the defendant] may have said about the terms of the contract." With respect to the intent requirement of the second element of the cause of action, the court later found: "More significantly, there's no evidence to support any . . . inference that [the defendant] acted intentionally, knowingly, with malice, wrongfully or tortiously to do anything to prevent his nephew and his brother from trying to achieve some relationship with Master P. There's just simply no evidence to that effect." Finally, with respect to the causation requirement of the third element of the cause of action, the court explained: "[C]ertainly, the activities and the efforts of [the defendant] did not cause the deal to fall though. The only real explanation that was given that had any semblance of truth to it was that Master P was going through a change of distribution arrangements, and that was one of—that was given as a possibility as to why they didn't go through."

Upon review of the record and considering the evidence, including reasonable inferences that may be drawn therefrom, in the light most favorable to the defendant, we conclude that the court's findings were legally and logically correct and amply supported by the facts appearing in the record. In particular, we find compelling the plaintiffs' lack of proof on the issue of causation. As Delone Robinson conceded, even if the allegations of the defendant's statements to Miller were true, there was no direct evidence that the statements *caused* No Limit Records to terminate its business negotiations with Fort Knox. A logical and reasonable explanation for the termination of the relationship, as Miller testified, was that Master P was going through a change in distribution companies at the time of the negotiations, which caused the termination. An equally plausible explanation for the breakdown in negotiations was

that the proposed changes made by Delone Robinson's Atlanta lawyer caused No Limit Records simply to walk away from the deal, a conclusion that is supported by the reasonable inference drawn from the testimony at trial of statements made by Delone Robinson that his Atlanta lawyer had "screwed up his deal."

In making its sufficiency of the evidence claim, the plaintiffs essentially request that we retry the court's factual findings and credit the testimony of Delone Robinson and Wanda Robinson over that of the defendant and Miller. Such a request runs directly counter to our standard of review, which requires us to view the evidence in the light most favorable to sustaining the court's finding and to accord deference to the factual findings of the trial court, which credited Miller's testimony. It is not the province of this court to retry the facts or evaluate the credibility of witnesses. *Bowman* v. *Williams*, 5 Conn. App. 235, 238, 497 A.2d 1015 (1985), appeal dismissed, 201 Conn. 366, 516 A.2d 1351 (1986).

The judgment is affirmed.

In this opinion the other judges concurred.