## 73-75 MAIN AVENUE, LLC *v.* PP DOOR ENTERPRISE, INC., ET AL.
### (AC 30667)

Bishop, DiPentima and Schaller, Js.

Argued December 4, 2009—officially released March 30, 2010

*Lewis Guangwei Hu,* for the appellants (named defendant et al.).

*Anthony D. Truglia, Jr.,* for the appellee (plaintiff).

*Opinion*

BISHOP, J. The defendants, PP Door Enterprise, Inc. (PP Door), and Ping Ying Li,[1] appeal from the judgment of the trial court in favor of the plaintiff, 73-75 Main

---

[1] A third defendant, Nan Zhang, was defaulted for failure to appear, and a default judgment was rendered against him. Because he is not a party to this appeal, we refer in this opinion to PP Door and Li as the defendants. Additionally, we note that there have been various spellings of the names Nan Zhang and Ping Ying Li throughout the pleadings of this case. We use the spellings set forth in the trial court transcripts.

Avenue, LLC, for breach of a commercial lease agreement. On appeal, the defendants claim that the court (1) lacked subject matter jurisdiction, (2) improperly found PP Door liable without proof that the lease was entered into under its name and under its authority and (3) based its conclusion on improper evidence. Additionally, Li claims that the court improperly held her liable as a guarantor without proof that she signed the guarantee agreement. We affirm in part and reverse in part the judgment of the trial court.[2]

The court reasonably could have found the following facts. On or about August 8, 2005, the plaintiff, the owner of commercial real estate located at 73 Main Street, Norwalk, entered into a written lease agreement with PP Door for the use and occupancy of a portion of the property, identified as Store #2.[3] The lease was executed by Lawrence W. Goichman, who was the principal member of the plaintiff and of S.C.G. Commercial Real Estate (S.C.G.), a property management company that managed the property at 73 Main Street. The lease also was signed by Nan Zhang, as manager of PP Door.[4] Each page of the lease agreement also was initialed by the signatories.

Prior to finalizing the lease agreement, and in accordance with its standard policy, the plaintiff required

[2] The record does not contain a memorandum of decision or a signed transcript setting forth the court's reasons for rendering judgment in favor of the plaintiff, as required by Practice Book § 64-1. Although this court has often declined to review claims on appeal when the requirements of Practice Book § 64-1 were not followed; see *Jezierny* v. *Jezierny*, 99 Conn. App. 158, 160–61, 912 A.2d 1127 (2007); we have, however, reviewed claims when an unsigned transcript has been filed that adequately reveals the basis for the court's decision. In this instance, we review the claims on that basis. See *Robinson* v. *Robinson*, 103 Conn. App. 69, 74 n.3, 927 A.2d 364 (2007).

[3] The lease was for a term of five years and two months, and PP Door agreed to pay $1669.79 per month in base rent for a period of two years, with an annual increase in the monthly rate during the remaining years of the lease term, plus 10.25 percent of certain common charges.

[4] The defendants deny that Zhang was a manager for PP Door or that he was authorized to act on their behalf.

that the principal officers of PP Door execute personal guarantees of the tenant's obligations, in the event of a default under the lease. Pursuant to this policy, the principal officers were asked to provide their credit information. On August 2, 2005, Zhang sent a facsimile transmission from PP Door to Darienne Donovan, a real estate broker, who was aiding with the lease transaction, and attached a completed form authorizing the release of credit information. The form contained the names, social security numbers, home addresses, dates of birth and the signatures of Zhang and Li. On the fax cover sheet, which bore the business name, address, telephone and fax numbers of PP Door, Zhang wrote to Donovan that "[a]ll plans for the Norwalk store [were] laid out last week. My company ha[s] put people and resources into this project. I understand the landlord is holding up time. Would you please try to expedite the lease-signing process."

In addition to completing the credit check, S.C.G. also conducted a corporate database search that verified that PP Door was a registered New York corporation located at 36-33 College Point Boulevard, Flushing, New York, which was the same address that appeared on the fax Zhang sent to Donovan. After this due diligence was completed, the lease and guarantee agreements were sent to Zhang and Li. Shortly thereafter, the documents were returned to the plaintiff with signatures.[5] On August 8, 2005, the day the lease was executed, a check in the amount of $5209.75, which represented the first month's rent, the last month's rent and one month security deposit, was paid to the plaintiff. The check bore the name Splendid Prosperity Company, and there was no testimony as to who signed the check. Upon receipt of the check and the signed lease

---

[5] Linda Gargano, an operations manager at S.C.G., testified that at the time the signed documents were received, the plaintiff had no reason to doubt the authenticity of the signatures.

agreement, the plaintiff permitted PP Door to take possession of the property and to commence its business operations.

As part of the agreement, the lease term was to commence September 1, 2005, and the defendants were given two months free rent. Thus, the portion of the August 8, 2005 check that represented the first month's rent, was payment for the month of November. The next five monthly payments, December through April, all were paid on schedule, and each of the checks was signed by Li. The December payment was written on a check from PYML U.S.A., Inc., which Li testified was the same as PP Door.[6] The next four payments were all written on PP Door checks. The April payment was the last monthly payment received by the plaintiff. PP Door failed to make any further monthly payments, nor did it pay the common charges.

At trial, Li testified that she was the sole owner and operator of PP Door. She denied that Zhang was the manager of PP Door and that he was employed in any way by PP Door. She also denied signing the guarantee agreement. She claimed that she signed the credit authorization form because Zhang told her that he was too young to have good credit, and, therefore, he needed her help so that he could lease the building.[7] Li claimed that she had no knowledge of the lease until she received notice that she was being sued. She admitted, however, that she paid the rent required by the lease and that she visited the store location to see the space

---

[6] Li testified that PYML U.S.A., Inc., had the same tax identification number as PP Door and that the business address listed for this entity was the same as her home address.

[7] On cross-examination, Li first testified that Zhang needed her to sign the credit authorization form because he was afraid he would not be able to lease the building. Then, when asked by the plaintiff's counsel, "[l]ease which building, ma'am? The building in Connecticut, correct?" she backtracked and said, "Every time he did not talk about leasing the building. He only said he needed a credit report because he wanted to do business."

before agreeing to make those payments.[8] Li testified that Zhang was her "[f]irst retail person" and that he wanted to be PP Door's Connecticut retailer, but, she maintained, nevertheless, Zhang did not have the authority to act on behalf of PP Door. Li represented that toward the end of 2005, Zhang was in a car accident and came to her for help paying his bills, and that before she would agree to pay the rent, she went to Norwalk to see the store location and its contents. She testified that she counted 107 doors, which she valued at $45,000. Despite this attention to the inventory, Li testified that she did not see the name "PP Door" on the storefront because she was sick from the drive to Connecticut. After five months, Li stopped payments when she realized that she was going to lose money. Li testified that Zhang had promised to pay her back for the rental payments she made, and when he failed to do so, she stopped payment.

After months went by without receiving payment, the plaintiff initiated a summary process action to recover possession of the property, in which it was successful. Additionally, on August 3, 2006, the plaintiff filed this action in order to recover money damages for past rent and the cost of finding a new tenant. Following trial, the court found in favor of the plaintiff. In its decision, the court rejected the defendants' special defense that it lacked personal jurisdiction over PP Door or Li because neither had done business in Connecticut. Despite the fact that PP Door was a registered New York corporation that did business primarily in New York, the court found that there was sufficient evidence that PP Door had done business in Connecticut. The court cited as evidence the existence of the fax from Zhang to the real estate broker in Connecticut, which mentioned the

[8] In the defendants' appellate brief, it is noted that when Zhang came to see Li about the credit authorization, she was aware that he was about to lease a space in Connecticut.

company's plans to open a Norwalk store and was faxed from the offices at PP Door to Connecticut. The court also took note of the lease agreement, which was negotiated with a Connecticut real estate company, and was completed for the purpose of operating a retail store in Connecticut.

In addition, the court found that as to PP Door's liability, even if Li did not sign the lease and the guarantee, PP Door had held Zhang out as its representative. Specifically, the court found that "Li and the company, PP Door, entered into this lease through the execution of that lease document. They have clearly put themselves out to the landlord that they were the authorized party renting that property and, or, authorizing Zhang to act as their representative. And the further binding fact is the first check of August 8, 2005, made out to [the plaintiff] . . . for . . . the first month's rent and the last month's rent and one month security. Now, why would PP Door and . . . Li make out a check for the equivalent of three month's rent—actually two month's rent plus one month of security, if it was not their intention to allow . . . Zhang to initiate this lease and that they were the responsible parties and that they were authorized or that he was authorized to act as their representative?" After the court rendered its decision, the defendants filed this appeal.

I

The defendants first claim that the court lacked subject matter jurisdiction. Specifically, the defendants argue that although it was appropriate for the plaintiff to have filed the action in the Superior Court Housing Session, once issues arose related to forgery, partnership, agency and apparent or actual authority, the housing court no longer had subject matter jurisdiction. This claim is without merit.

"[A] determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary . . . ." (Internal quotation marks omitted.) *Ross* v. *Zoning Board of Appeals*, 118 Conn. App. 90, 96, 983 A.2d 11 (2009).

In *Savage* v. *Aronson*, 214 Conn. 256, 571 A.2d 696 (1990), our Supreme Court answered the question that the defendants now raise. In that case, the court explained that, "[d]espite the familiar reference to the judicial district courtroom where the judge assigned to hear housing matters presides as the housing court, our statutes create no such special jurisdictional entity. Housing matters are included within the jurisdiction of the Superior Court . . . . The evident purpose of the statutes and rules relating to the divisions of the Superior Court was not to impose any jurisdictional limitation on judges but to achieve greater efficiency in the administration of the judicial department. . . . A judge assigned to the housing division at a particular judicial district is authorized by [General Statutes] § 47a-70 (a), after a case has first been placed on the housing docket, to transfer such matter to the regular docket for a geographical area or judicial district if he determines that such matter is not a housing matter or that such docket is more suitable for the disposition of the case." (Citations omitted; internal quotation marks omitted.) Id., 262. However, "[e]ven if it were clear that [a] complaint fails to allege circumstances constituting a housing matter as defined by [General Statutes] § 47a-68, it is plain that such a deficiency did not deprive the trial court of jurisdiction over the action. A judge of the Superior Court assigned to hear housing matters does not lose his general authority to hear any cause of action pending in that court. Since the plaintiffs' action was properly brought to the Superior Court, the trial judge, as a

member of that court, did not lack jurisdiction to decide it." Id., 263.

On the basis of the foregoing, the defendants' claim that the court lacked subject matter jurisdiction fails.

II

The defendants next claim that the court improperly found PP Door liable under the lease because the evidence presented at trial was insufficient to prove that the lease, which was signed by Zhang, was entered into with its actual or apparent authority. We are not persuaded.

Initially, because the court did not find that Zhang possessed actual authority to act on behalf of PP Door, we review only the court's finding of apparent authority. "Whether apparent authority exists is a question of fact, requiring the trier of fact to evaluate the parties' conduct in light of the attenuating circumstances. . . . Only in the clearest of circumstances, where no other conclusion could reasonably be reached, is the trier's determination of fact to be disturbed." (Citation omitted; internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 278, 976 A.2d 750 (2009). Thus, we review the court's finding under the clearly erroneous standard. Id., 274. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . As a reviewing court [w]e must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The weight to be given to the evidence and to the credibility of witnesses is solely within the determination of the trier of fact. . . . In reviewing factual findings, [w]e do not examine

the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id.

"Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Internal quotation marks omitted.) Id., 277–78.

On the basis of these criteria, we examine the trial evidence to determine whether the court could have found that Zhang had apparent authority to enter into the lease on behalf of PP Door. Linda Gargano, an operations manager at S.C.G., testified that before the plaintiff would enter into a contract to lease space to PP Door, the principal officers of PP Door were required to execute personal guarantees and to authorize the plaintiff to do credit checks. At trial, the plaintiff presented a copy of a fax from Zhang that bore PP Door's name, had been sent from its office and sent using its fax number. The fax cover sheet contained a note from Zhang, which stated that "[m]y company ha[s] put people and resources into this project." Attached to the fax was the credit authorization form, which contained

Li's personal information, including her social security number, and was personally signed by her.

Subsequently, the plaintiff sent the lease and guarantee agreements to PP Door, and received the documents back with signatures, including the guarantee agreement that was meant for Li. After the initial lease payment, which included the first and last month's rent and security deposit, each of the next five rent payments was by check from PP Door or its affiliate, PYML U.S.A., Inc., and all of the five checks were signed by Li. Contesting the liability of PP Door as to the lease, Li testified that Zhang needed her credit information so that he would be able to lease the building. On the basis of the foregoing evidence, we conclude that there was adequate evidence before the court on which it could have found that PP Door held Zhang out as possessing sufficient authority to sign the lease and that the plaintiff, acting in good faith, reasonably believed that Zhang had the necessary authority to bind PP Door. Thus, the court's determination that apparent authority existed, was not clearly erroneous.

III

The defendants next claim that the court's judgment should be reversed because it was based on evidence that was incorrect or was not presented at trial. We are not persuaded.

The defendants first object to the court's conclusion, during the reading of its decision, that "we have exhibits E, F, G, H, I, J, which are made out to [the plaintiff] and, in fact, check number 1452 is on the heading or the check heading of [PP Door], and [Li] herself admitted that she signed those checks." The defendants correctly point out that Li did not testify to signing all of those checks, but, rather, only that she signed exhibits E, F, G, H and I. There was no evidence presented as to who signed the check shown in exhibit J, which was

the initial payment consisting of first month's rent, last month's rent and security deposit. The defendants argue that this represents more than a mere misstatement by the court, as was evident from the court's subsequent rhetorical question, "why would PP Door and . . . Li make out a check for the equivalent of three month's rent—actually two months rent plus one month of security, if it was not their intention to allow . . . Zhang to initiate this lease and that they were the responsible parties and . . . that he was authorized to act as their representative?" The court went on to say that "[t]he fact that [Li] thought later on and stopped paying because [Zhang] had an accident and she realized that it probably was not a profitable lease any longer is of no consequence." The defendants claim that the court had no factual basis on which to make this statement. In sum, the defendants reason that the court's decision cannot stand because it relied on incorrect factual findings.

Initially, we set out the applicable standard of review. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237, 963 A.2d 943 (2009). Further, "[w]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 507, 827 A.2d 729 (2003).

The defendants correctly note that there was no evidence that Li signed the check shown in exhibit J. The court's statement that Li "admitted that she signed those checks," was inaccurate as it pertained to exhibit J. The court's statement was clearly erroneous; however, the court's ultimate conclusion that the check was written on behalf of PP Door was not clearly erroneous. There was testimony that the plaintiff received the check at the same time the lease and the guarantee agreements were returned with signatures. Under the circumstances, it would have been reasonable for the plaintiff to assume that the check was written on behalf of PP Door, and, for the court to conclude as such. Accordingly, the court's conclusion that the check was made out on behalf of PP Door was not clearly erroneous.

Even if we assume that the court's factual finding in this regard was clearly erroneous, it was harmless. The court did not base its decision solely on this single fact. As noted previously, the court based its decision on, among other things, the fax that was sent from PP Door to the real estate broker, the fact that Li willingly gave her credit information so that Zhang would be able to lease the building and that she made the next five monthly payments after the initial payment. Due to the overall strength of the evidence, which favors the court's conclusion, we conclude that the court's single erroneous factual finding was harmless.

The defendants next challenge the court's conclusion that "[t]he fact that [Li] thought later on and stopped paying because [Zhang] had an accident and she realized that it probably was not a profitable lease any longer is of no consequence." The defendants claim, to the contrary, that Li made the rent payments only to help Zhang after the accident. The defendants also claim that Li only intended to help Zhang temporarily and that she expected to be paid back, and that it was only

when she realized that she was not going to be paid back that she stopped paying the rent. Li testified that she stopped paying the rent when she realized that she was going to lose money.

There was, in fact, testimony that Zhang was in an accident late in 2005, but there was no evidence as to the specific date, the existence of, or extent of, any injuries or the circumstances of the accident. There was also no direct evidence that Li stopped paying the rent as a result of the accident, nor does the time line of events necessarily suggest such a conclusion. The first check that Li admitted to writing was in December, 2005, which could support Li's claim that she only helped Zhang financially due to his accident. Li's testimony, however, was somewhat contradictory. On direct examination, she testified that Zhang came to her for help after the accident and, before she wrote a check to pay the rent, she went to the leased building to "take a look" and counted the inventory. Shortly thereafter, during cross-examination, Li testified that she had not been to the store before she wrote the first check and that it was only after the car accident, when Zhang came to her for help, that she went to look at the store. At the store, Li took inventory and calculated the value of the doors on the premises. As a matter of common sense, if Li only intended to help Zhang because he was injured, it is unlikely that there would be a need to calculate the value of the inventory. Also, as the plaintiff pointed out at trial, it is noteworthy that Li claimed that she entered through the front door of the store but did not notice the name "PP Door" on the wall above the door in large lettering. She testified that she was not paying attention because she was sick due to the car trip to Connecticut. She was not, however, too sick to count all 107 doors that were stocked in the store and to calculate their approximate value. This apparently contradictory testimony provided the court ample

opportunity to gauge the credibility of Li's testimony in this regard.

Additionally, the court was faced with evidence that Zhang had a business relationship with Li, that he wanted to be PP Door's retailer in Connecticut and that Li had provided her credit information knowing that Zhang was attempting to lease a building in Connecticut. On the basis of the foregoing evidence, and keeping in mind, as we must, that the trial court is in the best position to assess the credibility of the witnesses "on the basis of its firsthand observation of their conduct, demeanor and attitude"; (internal quotation marks omitted) *LeBlanc* v. *New England Raceway, LLC*, supra, 116 Conn. App. 274; we conclude that the court's conclusion, while not the only logical interpretation of the facts, was not clearly erroneous.

IV

Li claims finally that the court improperly held her personally liable as a guarantor of the lease between the plaintiff and PP Door, without proof that she signed the guarantee agreement. Specifically, she alleges that because there was no evidence that she signed the guarantee agreement, the agreement is unenforceable against her. We agree.

We start by setting forth the standard of review and applicable legal principles. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Kelly* v. *Stop & Shop, Inc.*, 281 Conn. 768, 776, 918 A.2d 249 (2007). "Whether a contract . . . exists is a question of fact for the court to determine. . . . If the factual basis of the court's

decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Baron* v. *Culver & Associates, LLC*, 106 Conn. App. 600, 601–602, 942 A.2d 552 (2008).

A guarantee, similar to a suretyship,[9] is a contract, in which a party, sometimes referred to as a secondary obligor, "contracts to fulfill an obligation upon the default of the principal obligor." Restatement (Third), Suretyship and Guaranty § 1, comment (c), p. 6 (1996). To illustrate more clearly, in a situation involving a guarantee, there are typically two contracts that exist, one between A and B, and a second contract between A and C, whereby C promises that if B does not fulfill its obligation to A, then C will be responsible to A for B's obligation. See id., § 2, pp. 19–20. This type of agreement is generally subject to the same "requisites of contract formation" that apply to the formation of any other contract. Id., § 7. Furthermore, "[p]ursuant to the Statute of Frauds, a contract creating a secondary obligation is unenforceable as a contract to answer for the duty of another unless there is a written memorandum satisfying the Statute of Frauds or an exception applies." Id., § 11 (1); see also General Statutes § 52-550.[10] Specifically, "[a] promise to be surety for the

[9] The Restatement (Third) of Suretyship and Guaranty notes that "suretyship" and "guaranty" are two "common contractual mechanisms resulting in suretyship status . . . . Although there are important differences between the two mechanisms that should not be obscured, these differences relate to the duties contractually imposed on the secondary obligor by the secondary obligation and not to the nature of the rights inherent in suretyship status. . . . Thus, both are governed by the principles set forth in this Restatement." Restatement (Third), Suretyship and Guaranty § 1, comment (c), pp. 6–7 (1996).

[10] General Statutes § 52-550 (a) provides: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor

performance of a contractual obligation, made to the obligee, is binding if (a) the promise is in writing and *signed by the promisor* and recites a purported consideration . . . ." (Emphasis added.) 1 Restatement (Second), Contracts § 88, p. 234 (1981).

Therefore, in order for the court to have found Li personally liable as a guarantor of the lease, it had to find that there was a written guarantee agreement that satisfied the statute of frauds. More pointedly, the court had to find that the agreement had been personally signed by Li. There was, however, no factual basis presented at trial on which the court could have reached the conclusion that Li signed as guarantor.

At trial, the plaintiff entered into evidence a written guarantee agreement, which it claimed had been signed by Li. As noted, there was testimony that, pursuant to the lease agreement, the plaintiff required personal guarantees from the officers of PP Door, that the plaintiff sent the lease and guarantee agreements for Li and Zhang to Donovan, who in turn was to forward the documents along to PP Door, and that the plaintiff received back the guarantee agreement addressed to Li with a signature. Li testified that she did not sign the guarantee agreement and that the signature on the document was not hers. The plaintiff did not present any evidence to prove otherwise. Additionally, although the plaintiff presented the signed guarantee agreement, there was no evidence that Li had ever seen the agreement, let alone that she had executed it. The guarantee was also signed by a witness, but that person did

or administrator, upon a special promise to answer damages out of his own property; (2) *against any person upon any special promise to answer for the debt, default or miscarriage of another;* (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars." (Emphasis added.)

not testify and was not even identified. There were no other witnesses who claimed to know anything about the document, and there were no handwriting experts presented to identify the signature on the purported guarantee. Indeed, the court noted in issuing its decision orally that when comparing the signatures on the lease and guarantee agreements, "the court cannot determine whether or not they are . . . Li's signatures." On the basis of the evidence presented at trial, the court had no basis on which it could find that Li had signed the guarantee. Without evidence that Li signed the guarantee, the agreement is not binding on Li, and, accordingly, she cannot be held liable as a guarantor.

The judgment is reversed only with respect to Li and the case is remanded with direction to render judgment in her favor. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.